**HARDCORE CONCRETE, LLC, Respondent,**

v.

**FORTNER INSURANCE SERVICES, INC., Respondent,**

and

**Med James, Inc., Appellant.**

**No. 27437.**

Missouri Court of Appeals, Southern District, Division Two.

Feb. 28, 2007.

*Motion for Rehearing or Transfer Denied March 23, 2007.*

Application for Transfer Denied May 29, 2007.

John L. Mullen, Franke, Schulz & Mullen, P.C., Kansas City, for appellant.

W. Tom Norrid, Norrid & Robertson, P.C., Springfield, for respondent.

Before BARNEY, J., BATES, C.J., and LYNCH, J.

PER CURIAM.

Appellant Med James, Inc. ("Med James") appeals the trial court's judgment following a jury trial in favor of Respondent Hardcore Concrete, L.L.C. ("Hard-

core").[1] Hardcore submitted its case to the jury on a theory of negligence in which it asserted Med James was negligent in failing to attach the proper documentation to its commercial insurance policy and in failing to issue the policy agreed upon by the parties. The jury returned a verdict in favor of Hardcore in the amount of $160,000.00 and apportioned 95 percent fault to Med James. Med James asserts six points of trial court error discussed below. Point One is dispositive and only it shall be addressed.

The record reveals that Hardcore, a company that pours concrete foundation walls and other concrete structures, purchased a set of aluminum concrete forms valued at $33,000.00. As part of its financing agreement, Hardcore was required to obtain theft insurance. Hardcore contacted Mr. Fortner, an agent with Fortner Insurance, to aid it in obtaining the necessary insurance. Fortner Insurance contacted Med James, a managing general insurance agency, who in turn contacted Lloyd's of London ("Lloyd's"), an insurance coverage company.

In a telephone call, Mr. Fortner relayed to Robin Kelly ("Ms. Kelly"), an employee at Med James, the details of Hardcore's requirements for the insurance policy.[2]

Med James then issued a quote for insuring the aluminum forms and Hardcore completed an application for insurance coverage to be provided by Lloyd's. The completed policy was sent from Med James to Fortner Insurance. After review by Fortner Insurance, a series of corrections were made to the attached property schedules through communication with Med James and the policy was corrected. The final corrected policy had an effective date of June 30, 2003, but Med James did not send it to Fortner Insurance until August 29, 2003. Hardcore did not receive a final copy of the policy until September 24, 2003.

The aluminum concrete forms were stolen on or about September 1, 2003. Hardcore filed a claim with Med James under the insurance policy and the claim was denied by Lloyd's based on exclusionary language in the endorsement attached to the policy.

It was discovered at that time that Med James had attached the wrong endorsement to the insurance policy. On the endorsement designation form attached to Hardcore's policy, Med James had incorrectly attached the form entitled "MISCELLANEOUS PROPERTY FLOATER FORM (All Risk Form)," which only provided theft coverage in the event that there was "forcible entry either into such vehicle while all doors and windows thereof are closed and locked into a fully enclosed and locked luggage compartment, of which entry there are visible marks upon the exterior of said vehicle." Per the conversations with Mr. Fortner Med James should have attached an endorsement form entitled "TIRB–810AR CONTRACTORS EQUIPMENT FORM–ALL RISKS" which would have insured the aluminum forms against "[a]ll risks of direct physical loss or damage ... from any external cause, except ... loss occasioned by the

1. Fortner Insurance Services, Inc. ("Fortner Insurance") and Terry Fortner ("Mr. Fortner") were voluntarily dismissed from the lawsuit by Hardcore and do not appear in this appeal.

2. Mr. Fortner informed Ms. Kelly that Hardcore needed theft and other coverage on the

aluminum forms which it planned on chaining to a flat bed trailer when not in use. Mr. Fortner also told Ms. Kelly these aluminum forms would often be left at various locations and needed to be covered by the insurance at all locations where they might be utilized.

neglect of the Insured...." Med James admits it erred in making the wrong designation on the endorsement form attached to the policy.[3]

Hardcore filed suit against Med James on July 27, 2004, for breach of contract, vexatious refusal, negligence, and negligent misrepresentation. Hardcore brought no action against Lloyd's. As stated above, following a two-day jury trial, the jury returned a verdict in favor of Hardcore and against Med James in the amount of $160,000.00 and assessed 95 percent fault against Med James. This appeal by Med James followed.

In its first point, Med James asserts the trial court erred in denying its motions for directed verdict and judgment notwithstanding the verdict or, in the alternative, motion for new trial. It maintains that in Missouri there is no legal duty "owed by the managing general agent to an insured [because] the managing general agent is not an agent of the insured;" accordingly, Med James as "the managing general agent could not be liable under the negligence theory...." Med James asserts that

> as the agent of a disclosed principal, [Lloyd's], [Med James] cannot incur personal liability but rather the liability if any, is that of [Lloyd's] in that Med James was a disclosed managing general agent for [Lloyd's], Med James had no contact, communication or interaction with [Hardcore] and [Hardcore] was represented separately by [Mr. Fortner] of [Fortner Insurance], accordingly [Fortner Insurance] is the only agent of [Hardcore] and thus is the only party to owe [Hardcore] a duty.

■ The standard for review of a trial court's denial of a motion for directed verdict is "whether plaintiff presented sub-stantial evidence to prove the facts essential to the claim." *Benoit v. Missouri Hwy. and Transp. Comm'n,* 33 S.W.3d 663, 667 (Mo.App.2000). "The standard of review for the denial of a motion for judgment notwithstanding the verdict is the same as for review of a denial of a motion for directed verdict." *Gill Const., Inc. v. 18th & Vine Authority,* 157 S.W.3d 699, 717 (Mo.App.2004). We review the denial of such motions " 'as ... question[s] of law, viewed in the evidentiary light most favorable to the non-moving party....' " *Damon Pursell Const. Co. v. Missouri Hwy. and Transp. Comm'n,* 192 S.W.3d 461, 474–5 (Mo.App.2006) (quoting *Clark v. Belfonte Distrib., Inc.,* 163 S.W.3d 581, 584 (Mo.App.2005)). When the denial is based upon a conclusion of law, as in the present matter, "we review the trial court's decision *de novo.*" *Boggs v. Lay,* 164 S.W.3d 4, 15 (Mo.App.2005) (emphasis added).

■ "Each element that is required to establish liability on the part of Respondent must be supported by substantial evidence, which is 'competent evidence from which a trier of fact can reasonably decide the case.' " *Gulley v. Werth,* 61 S.W.3d 293, 296 (Mo.App.2001) (quoting *McNear v. Rhoades,* 992 S.W.2d 877, 884 (Mo.App. 1999)). "A directed verdict is proper if there is not substantial evidence to support one of the elements of a cause of action." *Gulley,* 61 S.W.3d at 296.

■ " '[A]gency is the fiduciary relation which results from the manifestation of consent by one person[,] a principal[,] to another[,] an agent[,] that the agent shall act on the principal's behalf and subject to the principal's control, and consent by the agent so to act.' " *Parshall v. Buetzer,* 195 S.W.3d 515, 519 (Mo.App.2006) (quoting Restatement (Second) of Agency § 1

---

**3.** Mr. Fortner testified he was unfamiliar with Lloyd's policy forms and he had never person-ally reviewed the forms when they were received by Fortner Insurance.

(1958)). "Actual 'authority is the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him.' " *Id.* (quoting Restatement (Second) of Agency § 1 (1958)). "Actual authority may be express or implied." *Nichols v. Prudential Ins. Co. of America,* 851 S.W.2d 657, 661 (Mo.App.1993). "Express authority is created when the principal explicitly tells the agent what to do" and "[i]mplied authority consists of those powers incidental and necessary to carry out the express authority." *Id.* "Absent an express grant of authority, the relationship may result from implied or apparent agency." *K & G Farms v. Monroe Cty. Serv. Co.,* 134 S.W.3d 40, 43 (Mo.App.2003).[4] "[A]n agent for a disclosed principal is not a party to a contract and is not liable for its nonperformance." *State ex rel William Ranni Associates, Inc. v. Hartenbach,* 742 S.W.2d 134, 140 (Mo. banc 1987).

"In an action for negligence, plaintiff must establish that defendant had a duty to plaintiff, that defendant failed to perform that duty, and that defendant's breach was the proximate cause of plaintiff's injury." *Hecker v. Missouri Prop. Ins. Placement Facility,* 891 S.W.2d 813, 816 (Mo. banc 1995). "It is universally agreed (or at least held) that the question of whether a duty exists is a question of law and, therefore, a question for the court alone." *Lumbermens Mut. Cas. Co. v. Thornton,* 92 S.W.3d 259, 266 (Mo.App. 2002). "Similarly, it is agreed that whether the duty that exists has been breached

is a question of fact for exclusive resolution by the jury" or fact finder. *Id.*

In our review of the facts in this case we find *Gauert v. Chris–Leef Gen. Agency, Inc.,* 123 S.W.3d 270, 271 (Mo.App.2003) is particularly persuasive. In *Gauert,* Mrs. Gauert's ("Gauert") husband was working in a convenience store owned by Kansas City Oil Company ("KCO") when he was killed during a robbery. *Id.* Gauert brought a wrongful death suit against the owners of KCO, the Collinses, "alleging that their negligence as landowners caused her husband's death." *Id.* Gauert and the Collinses "entered into an agreement ... wherein the Collins[es] agreed to allow judgment to be taken against them in an amount to be determined by the trial court with recovery from them limited to their insurance coverage." *Id.* This settlement was approved by the trial court. *Id.*

Thereafter, Gauert, "in her capacity as assignee of the Collinses," sued Chris–Leef General Agency, Inc. ("Chris–Leef") alleging that Chris–Leef, as the agent of KCO, "negligently failed to have the Collinses named as additional insureds on the KCO commercial liability policy." *Gauert,* 123 S.W.3d at 271. Chris–Leef subsequently filed a motion for summary judgment. *Id.*

The facts showed that "Chris–Leef [was] a managing general agency that provide[d] underwriting services for a number of insurance companies. It [did] not sell insurance." *Id.* at 272. The Collinses had contacted Sharon Javinsky ("Ms. Javinsky") at Encore Insurance Agency ("Encore") to purchase a commercial liability insurance policy on behalf of KCO. *Id.* Ms. Javinsky

---

4. As explained in *Nichols,* 851 S.W.2d at 661–62,

Apparent authority is created by the conduct of the principal which causes a third person reasonably to believe that another has the authority to act for the principal. A finding of apparent authority requires evidence that a principal has communicated

directly with the third party or has knowingly permitted its agent to exercise authority. Thus actual authority is created by the principal's manifestations to the agent, whereas apparent authority is created by the principal's manifestations to a third party.

sent the Collinses' application for insurance "to eight or nine potential wholesale suppliers including Chris–Leef." *Id.* After reviewing the insurance application, Chris–Leef determined "the application fell outside Chris–Leef's underwriting authority; therefore, Chris–Leef referred the application directly to the insurance company, Colony...." *Gauert,* 123 S.W.3d at 272. Chris–Leef then "received authorization from Colony ... to provide a quotation." *Id.* Thereafter, Chris–Leef "issued a binder for the coverage" and also "ordered inspections of the KCO properties on behalf of Colony." *Id.* at 273. After the "Colony policy was typed ... Chris–Leef provided Colony with a copy of the policy, the signed application, the binder, the worksheet, and the inspection report." *Id.* As previously related, "[t]he Collinses were not named on KCO's commercial liability policy as additional insureds." *Id.*

In part pertinent to our review, Chris Leef argued in its motion for summary judgment that neither Ms. Javinsky nor Encore, the insurance agent with whom the Collinses dealt, was the agent of Chris–Leef. *Gauert,* 123 S.W.3d at 271. Accordingly, Chris–Leef maintained it owed no duty to the Collinses or Gauert. *Id.* The trial court granted Chris–Leef's motion for summary judgment and Gauert appealed. *Id.*

The appellate court found "the undisputed evidence shows that Chris–Leef was not the Collinses' insurance agent" because

> [t]he Collinses never had contact with Chris–Leef. Mr. Collins testified in his deposition that he only dealt with Ms. Javinsky of Encore in obtaining commercial liability insurance for KCO. He further testified that he did not become aware of Chris–Leef until he saw its name on the Colony policy in his attorney's office.... Gauert argues that because Chris–Leef issued the binder for

insurance coverage, was named on the insurance policy as the producer, arranged for inspection of the property, and confirmed for the finance company that KCO had procured the coverage represented in the application for premium financing, it was acting as the insurance agent of KCO and the Collinses. These actions, however, were done for the benefit of the insurance company, Colony, for which Chris–Leef underwrites policies.

> Neither was Ms. Javinsky or her company, Encore, the agent of Chris–Leef either through actual or apparent authority. The undisputed evidence shows that as a managing general agency, Chris–Leef is a wholesale insurance supplier that underwrites insurance for a number of insurance companies. It does not have direct contact with insureds but instead receives business from approximately 350 insurance agencies ... such as Encore in this case. While Chris–Leef and Encore do have a business arrangement, the arrangement is not one of principal and agent. The relationship between Encore and Chris–Leef is one where Encore brings the customer and Chris–Leef brings the insurance policy. Chris–Leef does not provide any incentive to Encore for business referred to it and has no financial interest in Encore. It does not instruct Encore how to operate nor does it demand a certain sales volume from Encore. Additionally, Chris–Leef did nothing to cause the Collinses to believe that Encore had the authority to act for Chris–Leef.

*Id.* at 273–74.

 In the instant matter, Hardcore maintains Med James was acting as an agent for Hardcore, because its representative and Mr. Fortner communicated via telephone with Med James's representa-

tive, Ms. Kelly, concerning Hardcore's insurance needs, unlike in *Gauert*. Further, as additional proof that Med James was acting as Hardcore's insurance agent, Hardcore points to the fact that the completed policy in question from Lloyd's was sent by Med James to Fortner Insurance, and the claim of loss denial letter came from Med James, as well.

However, the record clearly shows Hardcore initially contacted Fortner Insurance to obtain coverage and, in turn, Mr. Fortner, acted as Hardcore's insurance agent by contacting Med James. *See Gauert*, 123 S.W.3d at 272 (holding that "[a]n insurance broker or agent who undertakes to procure insurance for a party, with a view to earning a commission, becomes the party's agent ...."). Indeed, throughout the entire telephone discussion between Med James and Mr. Fortner, Med James did not speak directly with Hardcore or its representative. Instead, Med James, through its representative, Ms. Kelly, spoke directly with Mr. Fortner of Fortner Insurance. It was Fortner Insurance, not Med James, which was attempting to procure insurance for Hardcore. Ultimately, the record shows it was Lloyd's, not Med James, that ordered the issuance of the insurance policy.

Furthermore, Mr. Fortner testified that he understood Med James was acting as a managing general agent and that a managing general agent acts on behalf of an insurance company exclusively. Med James, as a managing general agent, was merely the conduit through which this was performed. All of "[t]hese actions ... were done for the benefit of the insurance company, [Lloyd's], for which [Med James] underwrites policies." *Gauert*, 123 S.W.3d at 274.

▉ Likewise, Fortner Insurance and Mr. Fortner are not agents of Med James. Mr. Fortner related that he had submitted Hardcore's application for insurance to at least two separate managing general agencies and the record shows that as a managing general agency, Med James is in the business of "underwriting" insurance policies for several insurance companies. *See id.* Med James acts as a middleman between an insurance agent representing a client on the one hand, and various insurance companies with which Med James has a contractual relationship, on the other hand.

Ms. Kelly, a representative of Med James, testified that Med James, as an "underwriter for a company ... will look at [an application for insurance]" it receives from an insurance agent and it will "do an [analysis] on it...." Then, Med James "determine[s] which company [it] would place it in." Accordingly, we conclude that "[t]he relationship between [Fortner Insurance] and [Med James] is one where [Fortner Insurance] brings the customer and [Med James] brings the insurance policy." *Id.*

Also, the record clearly shows Med James exerts no control over Fortner Insurance nor holds any interest in Fortner Insurance. Mr. Fortner testified that he considered himself to be Hardcore's insurance agent and a representative from Hardcore agreed that Mr. Fortner was its insurance agent. Indeed, Hardcore paid its insurance premiums to Fortner Insurance not to Med James. There is nothing in the record which would suggest Fortner Insurance had the authority to act as an agent for Med James.

Here, the evidence clearly shows Lloyd's was Med James's principal and that Med James was an agent of Lloyd's. As such, there was a contract between Lloyd's and Med James which provided Med James would act as a managing general agent for Lloyd's. Similarly, there was a contract

between Lloyd's and Hardcore which provided that Hardcore would pay insurance premiums and Lloyd's would issue insurance coverage.

■ Additionally, Med James, who contracted with Lloyd's, owes no contractual duty to Hardcore in that Hardcore is not a party to Med James's contract with Lloyd's. Likewise, Med James is not a party to the contract for insurance between Hardcore and Lloyd's. It has long been held that a defendant who has contracted with another generally owes no duty to a plaintiff who is not a party to the contract, nor can a non-party sue for negligent performance of the contract. *Owens v. Unified Investigations & Sciences, Inc.*, 166 S.W.3d 89, 92 (Mo.App.2005). Accordingly, since Med James was not acting as an agent of Hardcore it had no legal duty to protect Hardcore's interests. It follows that Med James breached no contractual duty to Hardcore. *See id.*

■ We note that Hardcore maintains under *Miller v. Big River Concrete, LLC*, 14 S.W.3d 129, 134 (Mo.App.2000), "that a legal relationship or privity is not necessary for a person to owe another a duty under a [negligence] foreseeability analysis." The foregoing quote is too broadly stated, however. The "general common law rule is that a defendant who has contracted with another owes no duty to a plaintiff who was not a party to the contract, nor can that plaintiff sue for the negligent performance of the contract." *Fleischer v. Hellmuth, Obata & Kassabaum, Inc.*, 870 S.W.2d 832, 834 (Mo.App. 1993).

The Missouri Supreme Court, while recognizing exceptions to the general rule, has held that 'any extension of the limits of liability in this field should be done on a case-by-case basis, with a careful definition of the limits of liability, depending upon the differing conditions and circumstances to be found in individual cases.'

*Id.* at 834–35 (quoting *Westerhold v. Carroll,* 419 S.W.2d 73, 78 (Mo.1967)). However, because of our supreme court's holding in *Ranni,* 742 S.W.2d at 140, we are not inclined to extend the limits of liability as set out in *Westerhold,* 419 S.W.2d at 75, and *Miller,* 14 S.W.3d at 134, to the instant case.

*Ranni,* 742 S.W.2d at 135–36, was a suit involving third party beneficiaries against an insurer's general agent for the general agent's purported negligent handling of a claim. There, the Supreme Court of Missouri recognized that in certain situations, an agent's misfeasance in the execution of his duties can render him liable to a third party injured thereby.[5] *Id.* at 139. Our high court set out that "[t]hese cases can be distinguished because they involve an agent who committed separate tortious acts." *Id.* The *Ranni* court explained that "[n]one of the cases cited involve a situation where the agent's only wrong is an alleged breach of duties owed to his *principal.*" *Id.* at 139–40 (emphasis added).

Here, Med James was a disclosed agent of its principal, Lloyd's, and was acting on behalf of Lloyd's within the scope of its authorized authority when it dealt with Hardcore and Fortner Insurance.[6] *See id.*

---

**5.** No case cited in *Ranni* for this proposition involved a managing agent for an insurer.

**6.** As explained in 3 AM.JUR.2D *Agency* section 291,

An agent is not liable for lawful acts done within the scope of his or her authority for and on behalf of a disclosed principal. If a contract is made with a known agent acting within the scope of his or her authority for a disclosed principal, the contract is that of the principal alone and the agent is not a party to the contract and cannot be held liable thereon, unless credit has been given

at 140. In the preparation of the endorsement forms for the insurance policy, Med James was acting solely for Lloyd's. *See Gauert,* 123 S.W.3d at 274. "If [Hardcore] suffered economic loss from the acts of [Med James] as an agent, [its] remedy is to sue the principal, [Lloyd's]". *Ranni,* 742 S.W.2d at 140. Given these circumstances, it was Lloyd's that was responsible for any purported misconduct of its agent, Med James. *McHaffie v. Bunch,* 891 S.W.2d 822, 825 (Mo. banc 1995); *Tietjens v. General Motors Corp.,* 418 S.W.2d 75, 84 (Mo.1967).

■■■■■ Having said that, in our reading of *Ranni,* 742 S.W.2d at 140, we discern that the "mere failure to perform a contract cannot serve as the basis of tort liability for negligence." "To determine the character of an action, whether tort or contract, it is necessary to ascertain the source of the duty claimed to be violated." *Id.* Here, Hardcore originally sought insurance coverage for its loss pursuant to the contract it entered into between itself and Lloyd's.[7] "Here the source of the duty is in contract." *Id.* "Because the duty breached in this case stems from the contract, the breach does not amount to a tort." *Id.* Given the factual circumstances set out previously, Hardcore may be entitled to a reformation of its policy with Lloyd's to reflect the true intentions of both parties. "To be entitled to reforma-

tion, all a party need show is that the parties intended to agree to a particular result by the instrument but the instrument as executed was insufficient to effectuate their intention." *Kopff,* 838 S.W.2d at 453. This showing must be made by "clear, cogent and convincing ..." evidence. *Mills v. Cameron Mut. Ins. Co.,* 674 S.W.2d 244, 249 (Mo.App.1984). Once the policy is reformed to reflect the true intention of the parties, Hardcore would have all the remedies of a policy holder under Missouri law.

The trial court erred in denying Med James's motions for directed verdict and its motion for judgment notwithstanding the verdict. Hardcore failed to introduce substantial evidence that proved it was entitled to recovery on each element of its claim against Med James. *Thompson,* 935 S.W.2d at 336; *Gulley,* 61 S.W.3d at 296. Med James's first point has merit.

The judgment of the trial court is reversed.

---

expressly and exclusively to the agent and it appears that it was clearly the agent's intention to assume the obligation as a personal liability and that the agent has been informed that credit has been extended to him or her alone. However the mere fact a contracting party knew the identity of the other party's principal does not necessarily establish, as a matter of law, that the agent was not a party to the contract; rather, it merely permits an inference to that effect, which may be overcome by proving other facts connected with the transaction, including custom and usage.

No probative evidence exists in the record tending to show Med James assumed any obligation or liability as an entity separate from its actions on behalf of Lloyd's.

7. In this regard the facts do not establish that Lloyd's through its agent, Med James, ever intended to make a counter-offer to the application for insurance submitted by Hardcore. Rather, Lloyd's agent, Med James, made a clerical error which, with remarkable candor, Med James admitted. *See Kopff v. Economy Radiator Serv.,* 838 S.W.2d 449, 453 (Mo.App. 1992).